**FILED**
**Nov 17, 2021**
**09:00 AM(CT)**
**TENNESSEE COURT OF**
**WORKERS' COMPENSATION**
**CLAIMS**



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# IN THE COURT OF WORKERS' COMPENSATION CLAIMS
# AT JACKSON

| | | |
|---|---|---|
| **CHRISTOPHER CHAD MASSEY,** | ) | **Docket No. 2021-07-0259** |
| **Employee,** | ) | |
| **v.** | ) | |
| **TKE MFG., INC.,** | ) | **State File No. 41993-2021** |
| **Employer,** | ) | |
| **And** | ) | |
| **AGRI GENERAL INS. CO.,** | ) | **Judge Allen Phillips** |
| **Carrier.** | ) | |

---

## EXPEDITED HEARING ORDER FOR MEDICAL AND TEMPORARY DISABILITY BENEFITS

---

Mr. Massey requested medical and temporary disability benefits for a neck injury that TKE claimed did not arise out of his employment. The Court considered the parties' positions at an Expedited Hearing on November 9, 2021, and, for the following reasons, grants Mr. Massey's request.

### History of Claim

Mr. Massey claimed his injury occurred on March 8, 2021. He provided a written statement that reads: "I was looking up in the rack and I felt a pain in my neck like a pop. When I look [sic] back forward I had pain in my neck and numbness in my right arm." Mr. Massey thought the pain might have been related to a previous work-related neck injury at TKE in 2015.

TKE thought the same and returned Mr. Massey to neurosurgeon Dr. Fereidoon Parsioon, who treated him for the earlier injury−treatment that culminated in a fusion surgery to repair a herniated C6-7 disc that caused *left* arm pain.

On March 15, Dr. Parsioon recounted his earlier treatment and that he released Mr. Massey to regular duty as of March 9, 2017. As to this injury, he recorded Mr. Massey's history that, "about 10 days ago" he started having neck pain when he "was looking up at

1

work," and the pain "goes to the right arm." Dr. Parsioon did not provide a specific diagnosis and added that Mr. Massey might need an MRI. He took him off work. In response to a letter from TKE, Dr. Parsioon said, "this is new pain to right arm (previous injury was to left arm)."

TKE then provided Mr. Massey a panel of orthopedic surgeons because, as it asserted in its brief, Dr. Parsioon's "emphasis on right arm symptoms" led to "some confusion" as to the source of those symptoms. Specifically, TKE said it questioned whether Mr. Massey's pain came from his neck or from his right shoulder.

Mr. Massey chose Dr. Jeffrey Dlabach. On March 22, he told him that he was "at work and reaching and looking up on 3/8/21 and started to notice severe posterior right shoulder pain" radiating into his right arm. Dr. Dlabach diagnosed right-sided cervical radiculopathy, continued to keep Mr. Massey off work, and recommended an MRI.

Based on the MRI, Dr. Dlabach diagnosed an "acute" extruded C5-6-disc herniation. Further, because it was "at a different level" than before, Dr. Dlabach said the new herniation was "unrelated" to Mr. Massey's prior injury. On April 6, Dr. Dlabach recommended an epidural steroid injection and stated that a surgical referral would be the "next step."

TKE neither authorized a return visit to Dr. Dlabach nor provided the recommended injection. Instead, it provided a panel of neurosurgeons because, again from its brief, the MRI showed "it was evident that the source of the problem was the cervical spine."

Mr. Massey chose neurosurgeon Dr. John Brophy, who recorded a history that Mr. Massey "rotated and extended his neck while at work and noted a pop in his lower neck area . . . followed by right upper extremity paresthesias[.][1]" Dr. Brophy reviewed the MRI obtained by Dr. Dlabach and said it showed a large right-sided C5-6-disc herniation that "flattens and rotates the spinal cord." He also reviewed a post-surgery MRI from 2016 and said it showed the fusion at C6-7 and a "broad-base C5-6-disc bulge" without evidence of herniation or spinal cord compression.

Dr. Brophy diagnosed right C6 radiculopathy secondary to the herniation and agreed that Mr. Massey should have an epidural steroid injection. If the injection were unsuccessful, then Mr. Massey would be a surgical candidate. As to causation, Dr. Brophy said, "the history of rotating and extending his neck while at work is not sufficient to justify a claim of injury at work[.]" Thus, Dr. Brophy thought any further treatment should be "handled through [Mr. Massey's] personal insurance."

---

[1] Paresthesias are a burning or prickling sensation that is usually felt in the hands, arms, legs, or feet. They can happen when pressure is placed on a nerve. www.ninds.nih.gov/Disorders/All-Disorders/Paresthesia-Information-Page (last visited November 11, 2021).

TKE denied the claim based on Dr. Brophy's opinion, and Mr. Massey went on his own to spine specialist Dr. Francis Camillo. Dr. Camillo wrote, "in 2020, [Mr. Massey's] pain is down the right arm," but the pain "got really bad in March." He also confirmed Mr. Massey's current condition affected a different level of his spine than before. Dr. Camillo recommended discussed surgery, but Mr. Massey wanted to try a nerve block. When that was unsuccessful, Mr. Massey eventually agreed to it. He testified it is scheduled for November 18. Mr. Massey has used his personal insurance through TKE for Dr. Camillo's treatment.

The parties deposed Dr. Dlabach and Dr. Brophy. Dr. Dlabach confirmed Mr. Massey's history of looking up and reaching. He also said the MRI he ordered showed that a "piece" of disc had extruded at the C5-6 level, the extrusion affected the nerve at that level, and this finding was consistent with Mr. Massey's complaints. Dr. Dlabach testified a CT scan taken after Mr. Massey's earlier surgery did not show a herniated C5-6 disc, meaning, to him, that the herniation he saw on the MRI was a new injury.

Before his deposition, Mr. Massey provided Dr. Dlabach a copy of the definition of "injury" in the Tennessee Workers' Compensation Law. Dr. Dlabach testified that the history Mr. Massey provided him was "consistent" with the statutory definition. Mr. Massey later had Dr. Dlabach read the applicable statute into the record and then asked the following: "Based on the history that he has given you, his testimony to you or testimony to us falls under the category of an accidental injury?' Dr. Dlabach replied, "Yes."

On cross-examination, TKE questioned Dr. Dlabach by stating, "you've testified that [the] work was the primary cause of [the] injury," but that there was nothing in the history of turning his head that made Mr. Massey's injury "unique" to his employment. Dr. Dlabach replied, "Yes." Further, TKE asked Dr. Dlabach that, if Mr. Massey had turned his head at home, then "we wouldn't be here." Dr. Dlabach replied, "Yes."

Dr. Dlabach also testified in his deposition that because he does not perform spine surgery, he likely would have referred Mr. Massey to another surgeon.

At Dr. Brophy's deposition, TKE presented Dr. Parsioon's record that Mr. Massey said his pain began "10 days" before seeing him, meaning the pain began on March 5 rather than March 8. Dr. Brophy agreed but said Mr. Massey "was able to identify the moment the pain in his neck started." TKE also presented Dr. Camillo's record that the "2020 pain is down the right arm." Dr. Brophy said that would suggest that Mr. Massey had pain "long before March 8," and his condition would be consistent with a gradually occurring injury.

Dr. Brophy testified the 2016 MRI showed that the C5-6 disc was abnormal, but it "was not causing a medical problem." Conversely, the MRI after this injury showed the

3

disc abnormality had "transitioned to a herniated disc with nerve root and spinal cord compression."

Dr. Brophy said Mr. Massey's history of "rotating and extending" his neck meant to him, in "laymen's terms," that Mr. Massey "turned his neck to the side and looked up." When asked if anything "uniquely links Mr. Massey's onset of symptoms to his job activities other than just his presence at the work," Dr. Brophy said "No." Instead, he testified the primary cause of Mr. Massey's C5-6 "aggravation" was that "he appears to have a DNA propensity for cervical disc herniations based on 2016 and this most recent one without any associated strenuous activity."

At the hearing, Mr. Massey again said he turned his head to look up for parts when he felt a pop in his neck that was accompanied by pain and right-arm numbness. On cross-examination, he explained that he was "craning" his neck and turning to look up for the parts.

TKE also confronted Mr. Massey with what it called his inconsistent histories to the physicians. Specifically, TKE pointed to him telling Dr. Dlabach that he was "reaching" while telling the other doctors he was merely looking up or turning his head. Mr. Massey said looking up to find parts was "60 to 70%" of his job at the time, and that it was an "essential" part of the job.

Based on this proof, Mr. Massey contended he had shown a specific incident that primarily arose out of his employment, entitling him to the requested benefits. He argued Dr. Dlabach's testimony established that his current C5-6-disc herniation is a new injury based upon the doctor's specific reference to the statutory definition.

However, Mr. Massey's primary focus was on what he called TKE's "hijacking" of his treatment away from Dr. Dlabach when it provided the panel with Dr. Brophy. He said these facts are similar to those in *Ducros v. Metro Roofing and Metal Supply*, 2017 TN Wrk. Comp. App. Bd. LEXIS 62 (Oct. 17, 2017), where the employer refused to pay for treatment recommended by the authorized treating physician, instead providing the employee with a new panel and telling him that he must choose a new physician, or the employer could deny his claim. The Appeals Board held the employee was entitled to resume treatment with the original authorized treating physician.

Thus, Mr. Massey argued this Court should find Dr. Dlabach remains the authorized treating physician and order that TKE honor his recommendations. Alternatively, the Court should designate Dr. Camillo as the new authorized treating physician, as Mr. Massey had to seek treatment from him because of TKE's denial. As another alternative, Mr. Massey said he would agree to TKE providing him a panel of surgeons to perform the surgery if the Court did not designate either Dr. Dlabach or Dr. Camillo.

4

For its part, TKE pointed to Mr. Massey telling Dr. Dlabach that he was not only turning his head but also "reaching" at the same time. Further, Mr. Massey told Dr. Parsioon the injury occurred ten days before seeing him, meaning March 5 not March 8, and that he told Dr. Camillo of pain in "2020." TKE argued Mr. Massey's history is the only basis for Dr. Dlabach's causation opinion, and the "multiple inconsistencies" mean his opinion is unreliable.

TKE further questioned Dr. Dlabach's opinion because it said he was unaware of a an abnormal C5-6 disc before the injury here. It said Dr. Brophy was aware of the anatomic change−what he called an aggravation−but that it resulted from a "DNA propensity" for disc lesions and not a compensable work-related anatomic change.

As to the legal cause, TKE argued *Coleman v. St. Thomas Hosp.*, 334 S.W.3d 199, 206 (Tenn. Ct. App. 2010), stands for the proposition that an injury coincidental, contemporaneous, or collateral with the employment does not arise out of the employment. It contended Mr. Massey's injury fits that criteria. Further, TKE cited *Thornton v. Thyssen Krupp Elevator Mfg. Corp.,* No. W2006-00254-SC-WCM-WC, 2007 Tenn. LEXIS 359 (Tenn. Workers' Comp. Panel Apr. 24, 2007), and *Wilhelm v. Krogers*, 235 S.W.3d 122, 127 (Tenn. 2007), where the courts found no hazard incident to the employment that caused those employees' injuries.

The parties agreed Mr. Massey has not worked since Dr. Dlabach took him off work, and TKE agreed it offered no light duty because it does not offer light duty for non-work-related injuries. The parties further agreed TKE paid temporary disability benefits until May 23, when it denied the claim, and, for purposes of this hearing only, that his weekly compensation rate is $937.65.

## Findings of Fact and Conclusions of Law

At this Expedited Hearing, Mr. Massey must show he would likely prevail at a hearing on the merits. Tenn. Code Ann. § 50-6-239(d)(1).

*Legal definition of injury*

First, the Court must determine if Mr. Massey's injury meets the criteria for an injury arising out of the employment. The determination of whether an injury arises out of the employment is a question of fact. *Harris v. Nashville Ctr. for Rehabilitation and Healing*, 2021 TN Wrk. Comp. App. Bd. LEXIS 9, at *10 (Jan. 28, 2021).

"Arising out of" the employment refers to causation. *Id.* at *8. An injury arises out of the employment "when there is apparent to the rational mind, upon consideration of all of the circumstances, a causal connection between the conditions under which the work is required to be performed and the resulting injury." *Id.* The phrase "causal connection"

5

means "cause in the sense the accident had its origin in the hazards to which the employment exposed the employee while doing his work." *Id.* Conversely, an injury purely "coincidental, contemporaneous, or collateral, with the employment does not arise out of the employment." *Coleman,* 334 S.W.3d at 204.

TKE cited *Coleman* for the latter proposition, namely that Mr. Massey was merely present at TKE and his injury coincidentally happened. In short, turning his head at work was no different than if he had turned his head outside of work. The Court disagrees.

Though the Court in *Coleman* stated a purely coincidental, incidental injury is not compensable, it found the employees there *did* sustain compensable injuries. Specifically, the employees in *Coleman* worked in an office above a basement with a gas water heater. The heater leaked carbon monoxide and made the employees ill. The court found that exposure to carbon monoxide is not a peculiar risk to office workers in general, but it was a risk peculiar to *those employees* because of their location. 334 S.W.3d at 205. The same was true in *Harris,* where the Appeals Board held that roaches may not be a unique hazard to nurse's assistants, but the one that flew into the employee's face, causing her to fall, was a hazard to *her* employment. *Harris*, at *16.

The logic of *Coleman* and *Harris* applies here. Mr. Massey was not merely present at the place of injury nor was his injury coincidental, contemporaneous, or collateral to his work. Instead, his work *required* that he turn his head and look up for parts. He credibly testified without rebuttal that he did so sixty to seventy percent of his time at work and that it was an essential part of his job. That requirement created a hazard to which he was exposed because of his work.

Contrast these facts to *Thornton* and *Wilhelm,* where the employees' injuries were not related to any hazard incident to the employment when walking on a level floor. Instead, Mr. Massey *was exposed* to a hazard incident to his employment by his having to look up to find parts. Thus, the Court finds ample case law support that Mr. Massey's injury was one that arose from his employment.

*Medical causation*

The above finding does not end the inquiry. The Court also must consider whether the medical evidence supports an injury arising out of the employment. In that regard, TKE relied on Dr. Brophy's statement, which echoed TKE's argument that turning and looking up was not unique to Mr. Massey's work. Conversely, Dr. Dlabach offered his opinion by reference to the statutory definition of injury.

The Court finds Dr. Dlabach's opinion more compelling because it was based on his medical expertise applied to the statutory definition. Notably, the fact that Mr. Massey now has right-sided rather than left-sided complaints, as he did after the first injury,

6

distinguishes the two injuries.

Further, TKE's argument that Dr. Dlabach was unaware of the earlier study showing an abnormality at the C5-6 level is incorrect. He specifically said that a prior study in 2016 did not reveal an actual C5-6-disc herniation. Dr. Brophy agreed that prior studies did not reveal a disc causing medical problems, but Mr. Massey *now* has a herniation that makes him a surgical candidate.

For the above reasons, the Court holds that Dr. Dlabach's opinion provides a more feasible explanation than Dr. Brophy's for the causation of Mr. Massey's 2021 injury.

### *Medical benefits*

Mr. Massey characterized TKE's provision of the panel with Dr. Brophy as a "hijacking" of Dr. Dlabach's treatment. Semantics aside, it suffices to say that TKE first provided a panel that included Dr. Dlabach, and Mr. Massey chose him. Dr. Dlabach became the authorized treating physician at that time, and his recommendations are presumed medically necessary. *See* Tenn. Code Ann. § 50-6-204(a)(3)(H).

However, Mr. Massey is correct that TKE did not honor Dr. Dlabach's recommendations but instead offered the second panel. It did so because it believed the MRI showed a neck problem that was more amenable to neurosurgery than orthopedics. That was improper. "Parties and their lawyers cannot rely solely on their own medical interpretations of the evidence to successfully support their arguments." *Lurz v. Int'l Paper Co.*, 2018 TN Wrk. Comp. App. Bd. LEXIS 8, at *17 (Feb. 14, 2018).

An employer who elects to deny a claim runs the risk that it will be held responsible for medical benefits obtained from a provider of the employee's choice. *Young v. Young Elec. Co.*, 2016 TN Wrk. Comp. App. Bd. LEXIS 24, at *16 (May 25, 2016). TKE elected to deny Mr. Massey's claim, and he sought needed treatment from Dr. Camillo. The original authorized treating physician, Dr. Dlabach, does not perform spinal surgery, so the Court will not order that Mr. Massey return to him. Instead, the Court orders TKE to provide the treatment recommended by Dr. Camillo.

### *Temporary disability benefits*

The parties agreed Mr. Massey has not worked since Dr. Dlabach took him off work and that he was paid temporary total disability benefits only through May 23, when TKE denied the claim. TKE admitted it does not accommodate employees with restrictions for non-work-related conditions. Thus, given the above finding regarding compensability, the Court holds Mr. Massey is entitled to temporary disability benefits beginning May 23 and continuing until released to return to work or reaching maximum medical improvement.

7

Whether temporary total or temporary partial, the weekly benefit is the same, the stipulated rate of $937.65 per week.

**IT IS, THEREFORE, ORDERED** as follows:

1. TKE shall provide Mr. Massey reasonable and necessary medical treatment under Tennessee Code Annotated section 50-6-204(a)(1)(A) with Dr. Camillo.

2. TKE shall pay Mr. Massey temporary disability benefits from May 23, 2021, to November 15, 2021, a period of twenty-five weeks and one day, at the rate of $937.65, or $23,575.20. TKE shall continue periodic payments until Mr. Massey returns to work or is placed at maximum medical improvement.

3. The Court sets a Status Hearing on **Monday, March 7, 2022, at 9:00 a.m. Central time**. **The parties must call 731-422-5263 or toll-free 855-543-5038 to participate in the Hearing.**

4. Unless an interlocutory appeal of the Expedited Hearing Order is filed, compliance with this Order must occur no later than seven business days from the date of entry of this Order as required by Tennessee Code Annotated section 50-6-239(d)(3).

5. The Employer must submit confirmation of compliance with this Order to the Bureau by email to WCCompliance.Program@tn.gov no later than the seventh business day after entry of this Order. Failure to submit confirmation within seven business days may result in a penalty assessment for non-compliance. For questions regarding compliance, contact the Workers' Compensation Compliance Unit via email at WCCompliance.Program@tn.gov.

**ENTERED November 17, 2021**.

_____Allen Phillips_____
**Judge Allen Phillips**
**Court of Workers' Compensation Claims**

8

**APPENDIX**

<u>Exhibits:</u>

1. Deposition of Dr. Jeffrey Dlabach
2. Deposition of Dr. John Brophy
3. Collective Medical Records of Drs. Dlabach, Brophy, Parsioon and Camillo
4. Accident Detail Statement
5. First Employee's Choice of Physician Form
6. Second Employee's Choice of Physician Form

<u>Technical Record:</u>

1. Petition for Benefit Determination
2. Dispute Certification Notice
3. Request for Hearing
4. Employee's Pre-Hearing Statement
5. Employer's Position Statement
6. Employer's Witness and Exhibit List

**CERTIFICATE OF SERVICE**

I certify that a copy of this Order was sent as indicated on November 17, 2021.

| Name | Email | Service sent to: |
|------|-------|------------------|
| Jeffrey P. Boyd, Employee's Attorney | X | jboyd@borenandboyd.com<br>dmyles@borenandboyd.com |
| Hailey H. David, Employer's Attorney | X | davidh@waldrophall.com<br>smithj@waldrophall.com |

*Penny Shrum*
_____
**Penny Shrum, Court Clerk**
**Court of Workers' Compensation Claims**

9